THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COMAIR LIMITED,

               Plaintiff,

    v.

THE BOEING COMPANY,

               Defendant.

No. 2:23-cv-00176-RSM

**MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
JULY 7, 2025**

**ORAL ARGUMENT REQUESTED**

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

    A.    2012-2013: Comair pursues a MAX purchase. ...........................................3

    B.    September 2013: Comair and Boeing execute a purchase agreement for eight MAX airplanes. ...................................................................................5

    C.    2013-2016: Boeing updates Comair and the FAA about MCAS and the MAX development process. ................................................................................6

    D.    2018-2019: The MAX accidents and Comair's first delivery. ...............................7

    E.    2020-2021: Comair purports to cancel, and then repudiates and anticipatorily breaches, the contract. .......................................................................8

LEGAL STANDARD ..............................................................................................................9

ARGUMENT ...........................................................................................................................9

I.    Comair cannot establish fraudulent or negligent inducement [Counts 3-6]. .....................10

    A.    Comair cannot show that anyone at Boeing made false statements or omitted material information with the required knowledge and intent. .............................11

    B.    Boeing's pre-contract statements about the MAX were inactionable promises of future performance. .........................................................................13

    C.    Comair's concealment theories fail because Boeing did not violate any purported duty to disclose. .............................................................................15

    D.    The Deferred Prosecution Agreement does not support Comair's claims. ...........18

II.    Comair's fraud claims fail because Comair cannot show detrimental reliance on any alleged post-contract misrepresentations or omissions [Counts 3-6]. .......................20

    A.    Comair had no contractual right to terminate based on Boeing's alleged misrepresentations or omissions................................................................20

    B.    Comair had no right to terminate (or any other guarantees) under the "letter of comfort."................................................................................21

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-CV-00176-RSM – i

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

III.    Even if Comair prevails on its contract or negligent misrepresentation claims, it still cannot establish entitlement to non-warranty relief [Counts 1, 2, and 6]...................23

IV.    Comair's fraud claims for punitive damages are barred by Washington law [Counts 3-5]...........................................................................................................24

**CONCLUSION**.........................................................................................................24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Nat'l Bank of Detroit,*
  508 N.W.2d 464 (Mich. 1993) ......................................................... 13

*Alejandre v. Bull,*
  153 P.3d 864 (Wash. 2007) ...................................................... 16, 17

*Austin v. Ettl,*
  286 P.3d 85 (Wash. Ct. App. 2012) ...........................2, 15, 16, 17

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ................................................................. 19, 20

*Celotex v. Catrett,*
  477 U.S. 317 (1986) ..........................................................................9

*Chi. Title Ins. Co. v. Wash. State Off. of Ins. Comm'r,*
  309 P.3d 372 (Wash. 2013) .............................................................12

*City of Livonia Emps.' Ret. Sys. & Loc. 295 v. Boeing Co.,*
  711 F.3d 754 (7th Cir. 2013) ..........................................................18

*Coba v. Ford Motor Co.,*
  932 F.3d 114 (3d Cir. 2019) .....................................................17, 18

*Colonial Imports Inc. v. Carlton Nw.,*
  853 P.2d 913 (Wash. 1993) .......................................................15, 16

*Donald B. Murphy Contractors, Inc. v. King County,*
  49 P.3d 912 (Wash. Ct. App. 2002) ...............................................13

*Elcon Constr., Inc. v. E. Wash. Univ.,*
  273 P.3d 965 (Wash. 2012) ....................................1, 10, 11, 12, 20

*Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.,*
  2020 WL 513287 (N.D. Cal. Jan. 31, 2020)...................................13

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174,*
  500 P.3d 119 (2021), *rev'd on other grounds,* 598 U.S. 771 (2023) .......................15

*Guerrero Apodaca v. Eaton Corp.,*
  2020 WL 6799007 (W.D. Wash. Nov. 19, 2020)...........................17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

*In re Apple Comput., Inc.* ,
   127 F. App'x 296 (9th Cir. 2005) (unpublished)....................................................................13

*In re Comair Ltd.*,
   2021 WL 5312988 (Bankr. S.D.N.Y. Nov. 14, 2021)................................................................9

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*,
   65 F.4th 851 (6th Cir.) .......................................................................................................19, 20

*Matsushita Elec. v. Zenith Radio*,
   475 U.S. 574 (1986) ................................................................................................................9

*McRae v. Bolstad*,
   676 P.2d 496 (Wash. 1984) ...............................................................................1, 10, 11, 12

*Nathan Kimmel, Inc. v. DowElanco*,
   275 F.3d 1199 (9th Cir. 2002) ...............................................................................................19

*Oates v. Taylor*,
   199 P.2d 924 (Wash. 1948) ..................................................................................11, 15, 16

*Pope v. Univ. of Wash.*,
   852 P.2d 1055 (Wash. 1993), *amended*, 871 P.2d 590 (Wash. 1994).....................................18

*Schaff v. Highfield*,
   896 P.2d 665 (Wash. 1995) ...................................................................................................19

*Shook v. Scott*,
   353 P.2d 431 (Wash. 1960) ...............................................................................13, 14, 15

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
   365 F.3d 353 (5th Cir. 2004) .................................................................................................13

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008) ..................................................................................................13

*Timaero Ireland Ltd. v. Boeing Co.*,
   2021 WL 963815 (N.D. Ill. Mar. 15, 2021) ..........................................................................14

*Union Bank N.A. v. Blanchard*,
   378 P.3d 191 (Wash. Ct. App. 2016) .....................................................................................12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2

3    **Statutes and Regulations**

4    18 U.S.C. § 371 ...................................................................................................................20

5    14 C.F.R. pt. 21, subpts. B, H...........................................................................................19

6    14 C.F.R. pt. 121, subpt. N ...............................................................................................19

7    49 U.S.C. § 44709(a)(1)(B)................................................................................................20

8    RCW § 7.72.030(1) ............................................................................................................17

9

10   **Rules and Restatements**

11   Fed. R. Civ. P. 56(a) ...........................................................................................................9

12   Restatement (Third) of Agency § 5.03 cmt. (d)(2) (2006) ..........................................13

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

### INTRODUCTION

2     After extensive discovery, it is clear that the evidence cannot support any of Comair's

3 claims. Comair sued Boeing based on alleged Boeing statements and omissions about the 737

4 MAX that occurred either (i) years before the airplane *even existed*, or (ii) after Comair had entered

5 into a purchase agreement in 2013 that it had no right to cancel. At bottom, Comair contends that

6 Boeing defrauded it by failing to disclose a handful of purported design issues considered early in

7 the MAX's development relating to the Maneuvering Characteristics Augmentation System

8 ("MCAS"), because—half a decade later—that system contributed to two tragic airplane accidents

9 and the MAX's grounding, and the FAA ultimately required greater pilot training than originally

10 anticipated. But establishing fraud under Washington law requires, among other things, a showing

11 "by clear, cogent, and convincing evidence" of a representation of *existing* fact that the speaker

12 *knows* to be false—or *knowing* concealment of an *existing* defect—with *intent to deceive*, inducing

13 *reliance. See Elcon Constr. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012); *McRae v. Bolstad*,

14 676 P.2d 496, 500 (Wash. 1984). Comair cannot satisfy these elements for any of its fraud or

15 negligent misrepresentation claims.

16     To begin with, Comair has utterly failed to establish scienter—the *sine qua non* of its fraud

17 claims. To establish fraud, Washington law requires that the *speaker* have *knowledge* of a repre-

18 sentation's falsity, or of the information allegedly omitted, and intent to deceive. But there is no

19 evidence that any members of the Boeing sales campaign team who actually interacted with Co-

20 mair knew any information—including anything about the MAX's design and development—that

21 rendered their statements false or constituted material omissions. All these individuals gave unre-

22 butted testimony that they did not hear about MCAS or learn what it was until years later. Comair's

23 claims rest entirely on the purported knowledge of a handful of employees in the engineering and

24 flight test groups—who had no contact with Comair (or even with those within Boeing who had

25 contact with Comair)—which cannot sustain its fraud claims as a matter of law.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    Comair's fraud and negligent misrepresentation claims also fail because Boeing's pre-con-

2    tract statements about the MAX were inactionable promises of future performance. Discovery has

3    confirmed that Comair knew that (i) the MAX was just a "concept" when the parties negotiated

4    the purchase agreement; (ii) the design was evolving; (iii) the MAX would not be available until

5    at least four years after purchase; and (iv) the level of pilot training required for the MAX would

6    depend on the final design of the airplane and the approval of U.S. and South African regulators.

7    Boeing's alleged misstatements about the MAX—that it would be similar to the 737 NG and would

8    require only minimal training for pilots transitioning from the NG (including use of the same NG

9    flight simulator)—thus did not concern any *presently existing* fact, as Washington law requires.

10   Comair's own Operations Director confirmed that he could "[]not recall that at that time any rep-

11   resentative of Boeing made a false statement because the statements that were made at that time

12   had no foundation because the aircraft had not been produced yet." Declaration of Bradley D. Till

13   ("Till Decl.") Ex. 1 (Louw Dep. 83:12-21).

14   Comair's fraudulent concealment claims fail for similar reasons—namely, no evidence of

15   an existing defect in the MAX within Boeing's knowledge at the time of sale. The purported MAX

16   design issues that Comair identifies, including regarding MCAS, are at most *expectations* of *future*

17   facts rather than existing defects in an airplane that did not even exist yet—and would not for

18   years. Before the airplane was certified and entered service, moreover, the systems at issue would

19   be expected to—and in fact did—undergo multiple revisions and additional testing under Boeing's

20   established design process. These are precisely the type of "not-yet-extant" issues for which Wash-

21   ington law does not create a duty to disclose. *Austin v. Ettl*, 286 P.3d 85, 89 (Wash. Ct. App. 2012).

22   Comair also cannot satisfy the separate knowledge element of a fraudulent concealment claim, as

23   there is no evidence that anyone involved in interactions with Comair knew or even suspected that

24   there were any unaddressed defects in the MAX's design.

25   Nor can Comair save its fraud and negligent misrepresentation claims by pointing to the

26   conduct described in Boeing's 2021 deferred prosecution agreement ("DPA") with the U.S.

1    Department of Justice. That conduct did not start until at least three years *after* Comair signed the

2    purchase agreement. And to the extent Comair's claims rely on misrepresentations to the FAA,

3    that fraud-on-the-agency theory is preempted.

4        The post-contract aspects of Comair's fraud claims fail for yet another reason: Comair

5    could not have justifiably or detrimentally relied on any alleged post-contract misrepresentations

6    or omissions. Under Washington law, a party cannot rely on a representation when it has no *right*

7    to do so; and Comair had no right to cancel any airplanes or the entire purchase agreement for any

8    reason it claims Boeing should have disclosed. Nor does the "letter of comfort"—purportedly sent

9    to Comair by Boeing's Sales Director the day before the parties executed their purchase

10   agreement—help Comair. On its face, the letter only reinforces the *non-refundability* of Comair's

11   deposit and in any event would have been superseded by the purchase agreement's integration

12   clause. Simply put, Comair had no right to rely on any noncontractual representation in the "letter

13   of comfort"—as Comair's management reported to its Board at the time and for years after.

14       Comair's negligent misrepresentation and breach of contract claims should also be

15   dismissed because they are foreclosed by the contract's ███████████████████.

16       Finally, even if the fraud claims are allowed to proceed, Comair's claim for punitive

17   damages should be dismissed because Washington law forecloses it.

### STATEMENT OF FACTS

**A.    2012-2013: Comair pursues a MAX purchase.**

20       In August 2011, Boeing announced a new family of aircraft known as the MAX, which

21   would build upon Boeing's existing 737 line with larger, more efficient engines.[1] In 2012, Comair

22   and Boeing began discussing a potential MAX purchase. *See, e.g.*, Till Decl. Ex. 2. Comair's CEO

---

[1] Boeing, *Boeing Introduces 737 MAX With Launch of New Aircraft Family* (Aug. 30, 2011), https://boeing.mediaroom.com/2011-08-30-Boeing-Introduces-737-MAX-With-Launch-of-New-Aircraft-Family.

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  confirmed that fuel efficiency (from the newer engine) "was really the most fundamental compo-

2  nent" of why Comair purchased the MAX and that Comair ultimately "achieved better fuel effi-

3  ciency savings than what Boeing had originally promised." Declaration of Michael S. Paisner

4  ("Paisner Decl.") Ex. 1 (Venter Dep. 88:6-20).

5        **Boeing's campaign team.** Van Rex Gallard, Vice President of Sales for Africa, and Rob

6  Faye, Regional Sales Director for Africa, led Boeing's sales discussions with Comair. Paisner

7  Decl. Ex. 3 (Venter 30(b)(6) Dep. 98:7-11). Faye was supported by Ron Dubois, Regional Director

8  of Contracts, and Richard Krones, Regional Director of Marketing. *Id.* Ex. 4 (Dubois Dep. 28:11-

9  29:2); Till Decl. Ex. 3 (Faye Dep. 140:7-25). None of these individuals—all of whom worked on

10 the business rather than engineering side of Boeing—were familiar with the MAX's developing

11 design or knew about MCAS. Till Decl. Ex. 3 (Faye Dep. 100:9-103:14); *id.* Ex. 4 (Krones Dep.

12 151:25-152:6); Paisner Decl. Ex. 4 (Dubois Dep. 22:11-22, 178:25-179:23); Krones Decl. ¶ 6. It

13 was well-known to Comair that the MAX remained a concept that was "many years away" from

14 being fully configured, designed, built, flight-tested, and certified. Till Decl. Ex. 1 (Louw Dep.

15 81:10-82:3); *see also id.* 76:9-77:2, 97:10-16, 153:21-156:15; *id.* Ex. 4 (Krones Dep. 57:12-58:12);

16 *id.* Ex. 3 (Faye Dep. 116:24-119:2); *id.* Ex. 5 at -821; Paisner Decl. Ex. 3 (Venter 30(b)(6) Dep.

17 35:4-9, 50:22-25). Further, Boeing described the MAX's pilot training goal as a "target," reflecting

18 the airplane's early development stage and the need for regulatory approval of the training level

19 years in the future, Till Decl. Ex. 5 at -809; *id.* Ex. 4 (Krones Dep. 42:16-43:1), as Comair under-

20 stood, *id.* Ex. 1 (Louw Dep. 77:25-78:3, 81:6-82:3, 157:8-18).

21       **Boeing declines to make the deposit refundable.** Boeing's proposal to Comair included

22 a schedule for advance payments (also called "pre-delivery payments" or "PDPs"), including a 1%

23

24

25

26

1  deposit per airplane "upon execution of Purchase Agreement." *Id.* Ex. 6 at -525; *id.* Ex. 7.[2] Boeing

2  did not agree to make any of the advance payments contractually refundable. Paisner Decl. Ex. 3

3  (Venter 30(b)(6) Dep. 55:15-17, 85:8-12). Comair understood and accepted this risk, advising its

4  Board after the purchase that "Boeing [was] not prepared to commit" in the purchase agreement

5  to making the "1% deposit payable on signature . . . refundable up to 24 months prior to delivery."

6  *Id.* Ex. 7 at -194. Comair management reminded its Board of this years later, in 2016 and 2017.

7  Till Decl. Ex. 8 at -936; *id.* Ex. 9 at -88.

8         **B.**    **September 2013: Comair and Boeing execute a purchase**
                    **agreement for eight MAX airplanes.**

9

10         On September 18, 2013, Comair and Boeing entered into a purchase agreement for eight

11  MAX aircraft—each with separate delivery dates between January 2019 and October 2021—and

12  Comair wired a 1% deposit of ▮▮▮▮▮▮▮ to Boeing. *Id.* Ex. 10; *id.* Ex. 11. Section 5.8 of the

13  purchase agreement is an integration clause providing that the contract—the purchase agreement

14  plus an Aircraft General Terms Agreement ("AGTA") that the parties executed in 2010, *id.* Ex.

15  13)—"▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮." *Id.* Ex. 10 at -79. The contract contains no option to terminate up to 24 months before

17  delivery of the first aircraft. *Id.* And as Comair understood, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮. *Id.* Ex. 12 (Borer 30(b)(6) Dep. 29:20-30:1). The contract also did not commit to

20  any particular level of differences training for pilots transitioning from the NG to the MAX. *Id.*

21  Ex. 1 (Louw Dep. 175:15-176:20). Finally, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Ex. 13 (AGTA,

23  Ex. C §§ 4.1, 4.3, 11.1).

---

24        [2] Those Advance Payments were distinct from the small deposit (▮▮▮▮▮) due at proposal
acceptance, Till Decl. Ex. 7, which was refundable only if the purchase agreement was not exe-
25  cuted, *id.* Ex. 6 at -526. *See also id.* Ex. 4 (Krones Dep. 90:16-23, 192:19-194:12); Paisner Decl.
26  Ex. 3 (Venter 30(b)(6) Dep. 57:3-58:5).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2

### C. 2013-2016: Boeing updates Comair and the FAA about MCAS and the MAX development process.

Boeing encountered a number of challenges in designing the MAX, as is typical in any airplane development program. Declaration of Noel Lucero ("Lucero Decl.") ¶ 18. For example, the MAX's larger engines caused its nose to pitch up during an extreme flight maneuver called a high-speed, wind-up turn. *Id.* ¶¶ 19-20; Fisher Decl. Ex. 1 at -374-75. Boeing's engineers determined that Boeing needed to address this pitch-up characteristic to meet regulatory requirements. Till Decl. Ex. 14 (Lucero Dep. 51:1-15, 52:16-18); Fisher Decl. Ex. 2 at -410. Boeing made structural changes to the airplane and implemented a software program called MCAS, which would counter the pitch-up tendency by moving the airplane's horizontal stabilizer. Lucero Decl. ¶ 20; Fisher Decl. Ex. 1 at -375.[3] As originally designed, MCAS would activate only during a high-speed, wind-up turn. *Id.* In late 2012, Boeing's engineers and test pilots concluded that MCAS, along with the structural changes, resolved the high-speed pitch-up issue. *See* Fisher Decl. Ex. 3 at -30 ("All pilots are now unanimous that there is now a high speed pitch up solution."); *id.* Ex. 1 at -375. Boeing told the FAA about these changes. *Id.* Ex. 13 at -91 (2013 presentation explaining MCAS was "[i]mplemented … to address Airplane High Speed Pitch Up"); *id*. Ex. 14 at -09-10, -12; *id*. Ex. 15 at -399 (2014 presentation explaining MCAS "[a]ugments pitch stability" and was "[r]equired to maintain compliance to FAA Certification requirements"); Till Decl. Ex. 32; Fisher Decl. Ex. 16 at -197 (2014 meeting with FAA where purpose of MCAS was discussed).

In 2016—three years after Comair purchased its airplanes, and while the MAX was still under development—Boeing expanded MCAS's operational scope to also activate during lower-speed flight maneuvers. Fisher Decl. Ex. 11 at -905-07; Lucero Decl. ¶¶ 28-29. Till Decl. Ex. 14 (Lucero Dep. 69:2-70:9, 73:9-21, 256:18-25). Boeing told the FAA certification authorities who

---

[3] The horizontal stabilizer is a section of an aircraft's tail that can move up or down to help control the aircraft's stability and pitch (the angle of its nose). Lucero Decl. ¶ 20.

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

determine compliance with U.S. federal airworthiness standards about these changes. *See* Fisher Decl. Ex. 17 at -71-72 (presentation addressing changes at meeting with FAA in July 2016); *id.* Ex. 18; *id.* Ex. 19 at -2159-60; Till Decl. Ex. 23.

Boeing told Comair it was adding MCAS as a "[p]rincipal [c]hange[]" to the MAX in 2016. Till Decl. Ex. 15 at -487-88; *id.* Ex. 1 (Louw Dep. 264:5-8); Paisner Decl. Ex. 3 (Venter 30(b)(6) Dep. 120:3-6) (Boeing made "Comair aware of the MCAS system"). Boeing invited Comair to ask "any questions" it had about MCAS and other changes, Till Decl. Ex. 15 at -925, but Comair "didn't ask questions." *Id.* Ex. 1 (Louw Dep. 263:11-15).

### D.    2018-2019: The MAX accidents and Comair's first delivery.

In May 2017, the MAX took its first flight. Lucero Decl. ¶ 11. Around that time, Comair began experiencing significant financial troubles—including due to "very high financing cost[s]," Till Decl. Ex. 16 at -524, the "poor state of the [South African] economy and the continued weak exchange rate," *id.* Ex. 17 at -578—that jeopardized its ability to afford MAX airplanes and caused it to start seeking delivery delays.

In October 2018, a MAX operated by Lion Air crashed shortly after takeoff. Within a week, Boeing took steps to further inform its customers, including Comair, about MCAS. *See, e.g.*, *id.* Ex. 18 (message describing pilot procedures to address "AOA failure condition" caused by MCAS activation); Paisner Ex. 5 (same); Fisher Decl. Ex. 4 at -28, -104-05 (amended Flight Crew Operations Manual containing same guidance); Till Decl. Ex. 19 (Palacio 30(b)(6) Dep. 138:2-13) (same provided to Comair); Paisner Decl. Ex. 6 (message describing MCAS technical and operational details); Till Decl. Ex. 20 at -836-40 (slide deck with same); *id.* Ex. 21 (fleet team calls to reiterate MCAS information); Paisner Decl. Ex. 3 (Venter 30(b)(6) Dep. 120:21-25) (same). Neither Comair's corporate representative, nor any of its witnesses, could identify any "questions about MCAS that" Comair had "that weren't answered." Paisner Decl. Ex. 3 (Venter 30(b)(6) Dep. 120:8-10); *id.* Ex. 8 (Stander Dep. 199:6-200:12); Till Decl. Ex. 1 (Louw Dep. 296:18-298:5, 306:7-307:9, 309:7-22).

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    In November 2018, the South African equivalent of the FAA—the South African Civil

2    Aviation Authority ("CAA")—certified the MAX. Paisner Decl. Ex. 9. Boeing delivered the first

3    MAX to Comair in February 2019. Dkt. 1 ("Compl.") ¶ 176. Around this same time, as Comair's

4    financial troubles deepened, Comair sought further delivery delays. *See, e.g.*, Till Decl. Ex. 24.

5    On March 10, 2019, a MAX operated by Ethiopian Airlines crashed, again shortly after

6    takeoff.[4] Three days after the crash, the FAA temporarily grounded the MAX.[5] At the same time,

7    Boeing suspended all MAX deliveries due to the FAA grounding.[6]

8    The FAA lifted its grounding order in November 2020, as did the CAA in January 2021.[7]

9    **E.      2020-2021: Comair purports to cancel, and then**
      **repudiates and anticipatorily breaches, the contract.**

10

11    In February 2020, Comair sent Boeing a letter purporting to terminate the contract for the

12    seven remaining MAX deliveries and asserting a "cancellation and compensation claim" of over

13    $178 million. *Id.* Ex. 25 at -57. Boeing responded that it "disagree[d] with [Comair's] position"

14    and that Comair's termination was not effective. *Id.* Ex. 26 at -257. Shortly after, in May, Comair

15    entered South African business rescue proceedings due to the impact of the COVID pandemic. *See*

16    Paisner Decl. Ex. 11; *id.* Ex. 8 (Stander Dep. 301:18-302:7). In September 2020, Comair's

17

18    _____

19    [4] Jack Guy & Emily Dixon, *Which airlines are still flying Boeing 737 Max?*, CNN (Mar. 13, 2019), https://www.cnn.com/2019/03/11/africa/max-8-operations-roundup-intl.

20    [5] Federal Aviation Administration, *FAA Updates on Boeing 737 MAX* (Mar. 13, 2019),
21    https://www.faa.gov/newsroom/faa-updates-boeing-737-max-0.

22    [6] Rachel Layne, *Boeing 737 Max deliveries suspended in wake of U.S. grounding*, CBS
      News (Mar. 14, 2019), https://www.cbsnews.com/news/boeing-737-max-deliveries-suspended-
23    in-wake-of-u-s-grounding/.

24    [7] Federal Aviation Administration, *FAA Updates on Boeing 737 MAX* (Nov. 18, 2020),
25    https://www.faa.gov/newsroom/faa-updates-boeing-737-max-0; Sarah Robertson, *SACAA green-
      lights the MAX*, Southern Africa's travelnews (Jan. 6, 2021), https://www.travelnews.co.za/arti-
26    cle/sacaa-green-lights-max.

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    creditors approved a business rescue plan that assumed Comair would still take delivery of MAX

2    2-3. *Id.* Ex. 12 at -890; *In re Comair*, 2021 WL 5312988, at *3 (Bankr. S.D.N.Y. Nov. 14, 2021).

3        In February 2021, Comair sent Boeing and Comair's lender a letter saying Comair was

4    canceling all MAX airplanes and "rescind[ing] the Boeing Agreements, *in toto*." Till Decl. Ex. 27

5    at -285. In March 2021, Boeing accepted the termination with respect to MAX 2-3 under the

6    contract but explained that Comair's purported termination of MAX 4-8 was invalid and

7    constituted an anticipatory breach. *Id.* Ex. 28 at -159. By May 2022, Comair's restructuring efforts

8    had failed and Comair ceased all operations.[8]

9                                    **LEGAL STANDARD**

10       Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

11   to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

12   56(a). Once the moving party "demonstrate[s] the absence of a genuine issue of material fact,"

13   *Celotex v. Catrett*, 477 U.S. 317, 323 (1986), the nonmoving party "must come forward with

14   'specific facts showing that there is a genuine issue for trial," *Matsushita Elec. v. Zenith Radio*,

15   475 U.S. 574, 587 (1986) (citation and emphasis omitted). Summary judgment is warranted if the

16   nonmoving party fails "to establish the existence of an element essential to that party's case."

17   *Celotex*, 477 U.S. at 322.

18                                       **ARGUMENT**

19       Comair asserts six claims against Boeing: (1) breach of contract, (2) breach of the duty of

20   good faith and fair dealing, (3) fraudulent inducement, (4) fraudulent concealment, (5) fraudulent

21   misrepresentation, and (6) negligent misrepresentation. After extensive discovery, it is clear that

22   summary judgment is appropriate for all of Comair's claims. *Part I* below explains why Comair's

23   fraud and negligent misrepresentation claims fail to the extent they are based on Comair's theory

24   ───────────────────────

25       [8] South African Government, *Minister Lindiwe Sisulu on grounding of COMAIR* (June 1,
     2022), https://www.gov.za/news/media-statements/minister-lindiwe-sisulu-grounding-comair-01-
26   jun-2022.

1    that Boeing wrongfully induced its entry into the contract; *Part II* explains why those claims fail

2    to the extent they are based on Boeing's post-contract conduct; *Part III* explains why, even if

3    Comair prevails on its breach of contract or negligent misrepresentation claim, it is not entitled to

4    the non-warranty remedies it seeks; and *Part IV* explains that Washington law bars Comair's

5    request for punitive damages.

6    **I.    Comair cannot establish fraudulent or negligent inducement [Counts 3-6].**

7        Actionable fraud requires establishing nine elements "by clear, cogent, and convincing

8    evidence": (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's

9    knowledge of its falsity, (5) the speaker's intent to deceive, (6) plaintiff's ignorance of its falsity,

10   (7) plaintiff's reliance on its truth, (8) plaintiff's right to rely upon it, and (9) resulting damages.

11   *Elcon Constr.*, 273 P.3d at 970; *see McRae*, 676 P.2d at 500.

12       All three of Comair's fraud claims (Counts 3, 4, and 5) are based on the theory that Comair

13   was fraudulently induced into signing the purchase agreement in 2013 by alleged statements and

14   omissions about the MAX, pilot training requirements for MAX pilots, and MCAS. *See, e.g.*,

15   Compl. ¶¶ 258, 265, 269-70, 299, 315; Paisner Decl. Ex. 10 (Resp. to Interrog. 11). Comair claims

16   Boeing knew at the time that these representations were false and had a duty to disclose details

17   about MCAS because Boeing engineers encountered design issues in 2012. Compl. ¶¶ 43-48, 64,

18   270. Because Counts 3, 4, and 5 "rely on virtually the same set of allegations," they "can therefore

19   be addressed together." Dkt. 44 at 5. Count 6, for negligent misrepresentation, will also be

20   addressed below because it relies on the same set of allegations.

21       Comair's pre-contract fraud claims rest on what its witnesses claim were Boeing's "general

22   statements about the MAX operating the same as the NG and not requiring material additional

23   training." Paisner Decl. Ex. 3 (Venter 30(b)(6) Dep. 107:21-108:2); *see also id.* 102:14-103:7,

24   98:7-100:5; Till Decl. Ex. 1 (Louw Dep. 82:4-83:21, 163:13-167:14); Paisner Decl. Ex. 8 (Stander

25

26

Dep. 98:8-100:3); *id.* Ex. 10 (Resp. to Interrog. 11).[9] These claims fail as a matter of law for three separate and independent reasons. ***First***, Comair cannot show that any Boeing speaker *knew* his statements or omissions were false or misleading and that the speaker *intended to deceive*. ***Second***, these were not representations of *existing fact*, as the MAX was then only in the early stages of development. ***Third***, Boeing had no *duty to disclose* early issues that it encountered in designing the MAX. Nor can Comair save these claims by pointing to what Boeing did or did not tell the FAA, because both (i) the timing of these alleged statements and omissions precludes reliance and (ii) such fraud-on-the-agency claims are preempted.

### A. Comair cannot show that anyone at Boeing made false statements or omitted material information with the required knowledge and intent.

Comair's fraud claims fail because Comair cannot prove that anyone at Boeing knew his alleged statements or omissions were false or misleading and had intent to deceive. A "speaker's knowledge" of a representation's "falsity" and intent to deceive are required elements for fraud claims based on false statements. *Elcon Constr.*, 273 P.3d at 970; *McRae*, 676 P.2d at 500. Likewise, for fraud claims based on concealing material information, the omitted information must be "within [the person's] own knowledge." *Oates v. Taylor*, 199 P.2d 924, 927 (Wash. 1948).

Comair's Complaint asserts that Boeing "knew or should have known" that its alleged statements and omissions in 2013 about the MAX "were false" because of the use of MCAS to address the pitch up issue, various wind tunnel and flight simulator testing, and decisions about not including certain features on the MAX. Compl. ¶ 270; *see also id.* ¶¶ 64-70. But Comair cannot point to any evidence that any Boeing individual who interacted with Comair knew at the time anything that could have rendered his statements false or that he falsely omitted.

---

[9] Notably, these bare-bones testimonial allegations are far less specific than the initial allegations in Comair's Complaint that this Court highlighted in its Order on Boeing's Motion to Dismiss. Dkt. 44 at 6 (citing Compl. ¶¶ 265, 270).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Comair has identified only three Boeing employees who supposedly made false statements to Comair before it signed the 2013 purchase agreement: Gallard, Faye, and Joao Miguel Santos, who succeeded Faye as Sales Director. Paisner Decl. Ex. 10 (Resp. to Interrog. 11); *id.* Ex. 3 (Venter 30(b)(6) Dep. 101:2-102:5). To begin with, contrary to Comair's Complaint, Santos did not interact with Comair until 2014—*after* the purchase agreement was signed. *Id.* Ex. 13 (Santos Dep. 19:3-5); *id.* Ex. 14 at -523; *id.* Ex. 1 (Venter Dep. 101:13-103:13).[10] Nor is there any evidence that Faye or Gallard—or any other Boeing employee who communicated with Comair before contract signing, including Krones—was aware of the design issues or testing that supposedly rendered their alleged statements or omissions false. All have given unrebutted testimony that they were not aware of these issues—or even of the *existence* of MCAS—at the time. Till Decl. Ex. 3 (Faye Dep. 100:17-103:14, 222:9-15); Paisner Decl. Ex. 4 (Dubois Dep. 178:25-179:23, 207:10-208:12); Krones Decl. ¶ 6. Thus, Comair cannot offer "evidence that[] the maker of [any alleged] promise knew it to be false at the time made." *Union Bank v. Blanchard*, 378 P.3d 191, 201 (Wash. Ct. App. 2016).

Nor can Comair evade this conclusion by seeking to impute the knowledge of all Boeing employees to the specific individuals who interacted with Comair. No court applying Washington law has ever recognized such a theory of "collective scienter," which is fundamentally inconsistent with Washington's requirements regarding the "speaker's" knowledge and intent. *Elcon Constr.*, 273 P.3d at 970; *McRae*, 676 P.2d at 500. And the Restatement of Agency, which the Washington Supreme Court looks to for guidance on agency principles, *see, e.g.*, *Chi. Title v. Wash. State Off. of Ins. Comm'r*, 309 P.3d 372, 380 (Wash. 2013), explicitly rejects collective scienter. It has long said that "a principal may not be subject to liability for fraud if one agent makes a statement,

---

[10] Comair thus dedicated 15 paragraphs of its Complaint and a lengthy interrogatory response to conversations between Santos and Comair that cannot have happened. Compl. ¶¶ 12-14, 129-31, 133-35, 137, 265, 269, 286, 305, 321; Paisner Decl. Ex. 10 (Resp. to Interrog. 11).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

believing it to be true, while another agent knows facts that falsify the other agent's statement." Restatement (Third) of Agency § 5.03 cmt. (d)(2) (2006).

The Ninth Circuit has applied the same principle in the securities fraud context, holding that a "corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement." *In re Apple*, 127 F. App'x 296, 303 (9th Cir. 2005) (unpublished).[11] Other circuit courts have held the same.[12] Boeing is unaware of any state that permits fraud claims based on collective scienter. *See, e.g.*, *Adams v. Nat'l Bank of Detroit*, 508 N.W.2d 464, 480 (Mich. 1993) (imposing corporate liability for fraud "on the basis of imputed disconnected facts" "defies reason" and "conflicts with the basic principles underlying the law of intentional torts"). This Court should likewise hold Comair to the individualized knowledge and intent requirements of Washington law.

### B. Boeing's pre-contract statements about the MAX were inactionable promises of future performance.

Comair's fraud and negligent misrepresentation claims also fail because those causes of action require a material misrepresentation or omission of a "presently existing fact," *Donald B. Murphy Contractors v. King County*, 49 P.3d 912, 915 (Wash. Ct. App. 2002), and Comair cannot point to any such misrepresentation or omission before it signed the 2013 purchase agreement.

A seller does not misrepresent an existing fact where fulfilling the statement "depends upon . . . a future act, or upon the occurrence of a future event." *Shook v. Scott*, 353 P.2d 431, 434 (Wash. 1960). That is the case with respect to Boeing's alleged misstatements, because the MAX literally did not exist when Comair agreed to purchase it in 2013. Lucero Decl. ¶ 11. Instead, it was a "firm concept," Till Decl. Ex. 5 at -821; *id.* Ex. 3 (Faye Dep. 117:6-25), or more colloquially, a "paper

---

[11] Federal courts rely on securities fraud cases in rejecting liability for common law fraud based on collective scienter. *See, e.g.*, *Five Star v. Fresh Express*, 2020 WL 513287, at *5 (N.D. Cal. Jan. 31, 2020).

[12] *See, e.g.*, *Teamsters Loc. 445 v. Dynex*, 531 F.3d 190, 195 (2d Cir. 2008); *Southland v. INSpire*, 365 F.3d 353, 366-67 (5th Cir. 2004).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  airplane," *id.* Ex. 22 (Krones 30(b)(6) Dep. 58:13-59:1). Boeing did not finalize the MAX's basic

2  design until 2014 and did not flight test it until 2016. Lucero Decl. ¶¶ 11, 14. FAA certification

3  authorities did not approve the MAX as airworthy until March 2017, *id.* ¶ 16; Paisner Decl. Ex. 15

4  at -679, -742, and the CAA did not approve Comair's training plan for the MAX until May 2018.

5  Till Decl. Ex. 29 at 3. In every relevant sense then, "all of Boeing's allegedly fraudulent statements

6  were promises about a future machine rather than descriptions of an existing machine of known

7  characteristics." *Timaero v. Boeing*, 2021 WL 963815, at *4 (N.D. Ill. Mar. 15, 2021).

8       There is no dispute about this fundamental and dispositive fact—or that Comair knew it at

9  the time. Comair's expert acknowledged that, in 2013, there were still "additional years and [years]

10 of design and development work left to go." Paisner Decl. Ex. 16 (Downey Dep. 87:8-12).

11 Comair's CEO confirmed that he understood the MAX did not exist yet when Comair ordered it

12 and would not be available until 2017 *at the earliest*. *Id.* Ex. 3 (Venter 30(b)(6) Dep. 35:4-9, 50:22-

13 25). And Comair's Operations Director could "[]not recall that at that time any representative of

14 Boeing made a false statement because the statements made at that time had no foundation because

15 the aircraft had not been produced yet." Till Decl. Ex. 1 (Louw Dep. 83:12-21).

16       Likewise, Comair knew that the CAA, not Boeing, would determine the level of training

17 that Comair's pilots would need to fly the MAX. *Id.* 56:9-57:7, 60:5-16; Paisner Decl. Ex. 8

18 (Stander Dep. 32:7-11); *see also id.* Ex. 17 (Thomson 30(b)(6) Dep. 65:9-66:14). Comair also

19 knew that the CAA would not make its determination until "many years" after Comair agreed to

20 purchase the MAX. Till Decl. Ex. 1 (Louw Dep. 81:6-82:3); *see also supra* p. 4. And Comair knew

21 that *it was responsible* for securing the CAA's approval of a training plan for Comair's pilots. Till

22 Decl. Ex. 1 (Louw Dep. at 60:17-63:6); *see also* Paisner Decl. Ex. 17 (Thomson 30(b)(6) Dep.

23 65:9-66:14). Comair thus would have understood that the accuracy of Boeing's purported

24 statements about training depended on the "future acts" of Boeing, the CAA, and even Comair

25 itself. *Shook*, 353 P.2d at 356.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Boeing's marketing materials accurately conveyed this contingency and uncertainty. For example, Comair relies heavily on a fleeting reference to flight simulators in a July 2013 presentation. Till Decl. Ex. 5 at -819. But even assuming Comair saw it,[13] the presentation clearly describes "Level B" pilot differences training as a "Target," *id.* at -809, and sets out the lengthy MAX development schedule discussed above—with entry into service not expected until 2017, *id.* at -821. Any representations in this presentation thus necessarily would have been understood in context as "express[ing]" at most "a promise of future action." *Glacier v. Int'l Bhd. of Teamsters*, 500 P.3d 119, 136-37 (2021), *rev'd on other grounds*, 598 U.S. 771 (2023).

Accordingly, here, as in *Shook*, any statements by Boeing about similarities between the NG and the MAX, or about pilot training requirements, would be at most inactionable statements about "future performance," not "existing fact." 353 P.2d at 434.

### C. Comair's concealment theories fail because Boeing did not violate any purported duty to disclose.

Similarly, summary judgment is appropriate for Comair's fraudulent concealment claim because the MAX and MCAS were in the early stages of development when the parties signed the 2013 purchase agreement.[14] To prove fraudulent concealment, Comair must establish that Boeing had a "duty to disclose" the challenged omissions. *Oates*, 199 P.2d at 927. "Some type of special relationship must exist before the duty will arise." *Colonial Imports v. Carlton Nw.*, 853 P.2d 913, 917 (Wash. 1993).

Even then, the duty is limited. Washington has refused to require parties to arm's-length transactions to disclose issues that *might* arise in the future. In *Oates*, a company was not required

---

[13] The record does not confirm that this presentation was ever shown or sent to Comair. Paisner Decl. Ex. 21 (Krones 30(b)(6) 4/2/25 Dep. 318:15-319:1, 330:2-331:16).

[14] Comair's negligent misrepresentation claim, Count 6, cannot proceed on a concealment theory for the additional, independent reason that "[a]n omission alone cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation." *Austin*, 286 P.3d at 89 (quoting *Ross v. Kirner*, 172 P.3d 701 (Wash. 2007)).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  to disclose to an "experienced business man" the risk that the company could collapse in the future

2  due to its "precarious financial condition." 199 P.2d at 928. Likewise, a home seller was not

3  required to disclose the risk of a costly assessment because "Washington law does not impose a

4  duty on a seller to disclose not-yet-extant encumbrances." *Austin*, 286 P.3d at 89. And even a

5  concealed defect gives rise to actionable fraud only if the seller has "knowledge of the defect."

6  *Alejandre v. Bull*, 153 P.3d 864, 872 (Wash. 2007); *see also Colonial Imports*, 853 P.2d at 917

7  (articulating "knowledge" requirement) (citations omitted).

8      The record here cannot support finding that the MAX had a design defect when Comair

9  signed its purchase agreement in 2013—let alone one that Boeing knew about. Comair alleges that

10  a handful of individuals at Boeing made concerning discoveries during this time about the MAX,

11  including during wind tunnel and flight simulator testing. Compl. ¶¶ 48, 64-70. But in 2013, the

12  MAX was still under development and was years away from certification and entry into service.

13  *See supra* at Section I.B. MCAS was designed, along with aerodynamic changes to the airplane,

14  to address and resolve the pitch-up characteristics issue identified during the wind tunnel testing,

15  as Boeing disclosed to the FAA on multiple occasions. *See supra* pp. 6-7. And while Comair

16  emphasizes the results of flight simulator testing of MCAS in 2012, Compl. ¶ 64, the system was

17  then in the preliminary design stages—and would subsequently undergo five separate, formally

18  documented revisions to its preliminary design requirements before MAX certification in 2017.

19  Lucero Decl. ¶¶ 19-29; *see also* Fisher Decl. Ex. 6 at -407.

20      Boeing is not aware of any case holding that a manufacturer has a duty to disclose the

21  *possibility* that a defect may be present years in the future when a product is built *if* the

22  manufacturer is unable to resolve design issues it is working to fix. Rather, the issues that Comair

23  points to—including the results of early wind tunnel and simulator testing, and Boeing's

24

25

26

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 16

consideration of potential design features like the MCAS annunciator and synthetic airspeed[15]—are exactly the type of "not-yet-extant" issues that Washington law does not create a duty to disclose. *Austin*, 286 P.3d at 89. Further reinforcing that conclusion is the definition of a "design defect" under the Washington Product Liability Act, which looks to "the time of manufacture" in determining whether a defect exists. *See* RCW § 7.72.030(1); *Guerrero Apodaca v. Eaton*, 2020 WL 6799007, at *1 (W.D. Wash. Nov. 19, 2020). That was still years away when Boeing and Comair negotiated their purchase agreement.

Moreover, the consensus within Boeing was that the issues identified by Comair had been resolved by 2013. Accordingly, even if there was a defect, it was not *known*. *See Alejandre*, 153 P.3d at 871-72. Far from suggesting widespread concern about the wind tunnel and flight simulator testing results, the evidence from 2012-2013 shows agreement within the engineering and test pilot communities that MCAS—combined with aerodynamic changes to the airplane—had adequately solved the MAX's pitch-up issues.[16]

That forecloses any finding of the knowledge necessary for fraudulent concealment, as illustrated by *Coba v. Ford Motor Co.*, 932 F.3d 114 (3d Cir. 2019).[17] That decision held that Ford lacked knowledge of a design defect causing the delamination of fuel tanks—even though "Ford knew that the problem had existed for several years and was investigating its cause"—because Ford "believ[ed] that the problem was due to instances of contaminated fuel . . . rather than a

---

[15] Till Decl. Ex. 14 (Lucero 30(b)(6) Dep. 126:25-127:7, 197:12-198:2, 202:1-7); Fisher Decl. Ex. 5 (Ewbank Dep. 174:3-25) (synthetic airspeed); *id.* 163:3-164:4, 166:9-167:13, 194:10-196:19 (annunciator light).

[16] *See* Fisher Decl. Ex. 3 at -30 (MCAS and aerodynamic changes "provided an acceptable configuration"); *id.* ("All pilots are now unanimous that there is now a high speed pitch up solution."); *id.* Ex. 1 at -375 (stating pitch up characteristics "improved enough with MCAS active to provide a desirable increase in stick force gradient and a reduced pitch up tendency"); *id.* Ex. 2 at -410 (similar).

[17] The Third Circuit in *Coba* was applying the New Jersey Consumer Fraud Act, which has very similar elements to fraudulent concealment under Washington law. *See* 932 F.3d at 124.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    defectively designed tank." *Id.* at 125. Significantly, the evidence showed "that some Ford

2    engineers had doubts whether biodiesel was the problem and they were continuing to investigate."

3    *Id.* These doubts notwithstanding, the company still "had every reason to believe [the delamination

4    risk] was mitigated," and therefore was not under a duty to disclose the issue. *Id.* at 126.

5        So too here. No Washington (or other) precedent suggests that awareness by a few

6    working-level engineers of concerns early in a product development process triggers a duty to

7    disclose, especially when the evidence shows widespread belief that the risk has been mitigated.

8    *Cf. Pope v. Univ. of Wash.*, 852 P.2d 1055, 1063 (Wash. 1993) (no disclosure obligation where no

9    corporate "consensus" on the issue), *amended*, 871 P.2d 590 (Wash. 1994); *City of Livonia Emps.'*

10   *Ret. Sys. v. Boeing*, 711 F.3d 754, 758-59 (7th Cir. 2013) (refusing to impose a "duty of total

11   corporate transparency—no rule that every hitch or glitch, every pratfall in a company's operations

12   must be disclosed in 'real time'").

### D.    The Deferred Prosecution Agreement does not support Comair's claims.

13

14       Comair cannot save its fraud and negligent misrepresentation claims by pointing to

15   Boeing's 2021 DPA with the U.S. Department of Justice. Boeing admitted in the DPA that, starting

16   in November 2016, two non-executive pilots engaged in a conspiracy to deceive the FAA Aircraft

17   Evaluation Group ("AEG")—which is responsible for approving pilot training requirements for

18   U.S.-based airlines—about changes to MCAS. Paisner Decl. ¶ 20.[18] Comair's reliance on the DPA

19   fails for two reasons: timing and preemption.

20       ***Timing.*** The misconduct described in the DPA began in November 2016 and related to

21   MCAS design changes earlier that year. Those actions cannot give rise to a claim that Boeing

22   fraudulently or negligently induced Comair into signing a purchase agreement *three years earlier*.

23

24

25       [18] The AEG is "entirely different" from the FAA's certification authorities who determine

26   whether "the airplane [meets] U.S. federal airworthiness standards." Paisner Decl. ¶ 20.

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1  *See Schaff v. Highfield*, 896 P.2d 665, 672 (Wash. 1995) (buyer could not have relied on report he

2  read after purchasing home).

3      **Preemption.** Comair also advances a "fraud-on-the-agency" theory that Boeing defrauded

4  Comair by defrauding the FAA and causing the FAA to provide Comair with inaccurate infor-

5  mation. Compl. ¶ 280; Paisner Decl. Ex. 10 (Resp. to Interrog. 11). But such claims are preempted.

6  *See Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-51 (2001).

7      *Buckman* involved state-law fraud claims against a medical device manufacturer. 531 U.S.

8  at 343. The Court deemed those claims preempted because (1) the "comprehensive scheme" es-

9  tablished by the Food, Drug, and Cosmetic Act required and regulated disclosures to the agency,

10 (2) "the federal statutory scheme amply empower[ed] the [Food and Drug Administration

11 ('FDA')] to punish and deter fraud against the Administration," and (3) "[s]tate-law fraud-on-the-

12 FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the

13 Administration's judgment and objectives." *Id.* at 347-51. The Ninth Circuit has applied *Buckman*

14 to state-law fraud claims involving other federal agencies. *See Nathan Kimmel v. DowElanco*, 275

15 F.3d 1199, 1205-06 (9th Cir. 2002) (claims based on submission of false information to Environ-

16 mental Protection Agency); *see also In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ.

17 Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 860-64 (6th Cir.) (same).

18     *Buckman* and its progeny preclude Comair's fraud and negligent misrepresentation claims

19 to the extent they "hinge[] upon [Comair's] contention that [Boeing] committed fraud against the

20 [FAA]." *Nathan Kimmel*, 275 F.3d at 1205. As in *Buckman*, the Federal Aviation Act's "compre-

21 hensive scheme" required and regulated the interactions between Boeing and the FAA on which

22 Comair relies. 531 U.S. at 348. For example, FAA regulations address whether to certify an aircraft

23 design, deem an aircraft airworthy, and approve pilot and other types of training. 14 C.F.R. pt. 21,

24 subpts. B, H; *id.* at pt. 121, subpt. N. They also require airplane manufacturers like Boeing to

25 provide detailed information to the FAA. *See, e.g.*, *id.* §§ 21.21(b), 121.418(b). And the FAA, like

26 the FDA, "has at its disposal a variety of enforcement options that allow it to make a measured

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 19

response to suspected fraud upon the Administration." *Buckman*, 531 U.S. at 349. Those include revoking a certificate of approval, 14 C.F.R. § 21.2(b), or seeking civil penalties, 49 U.S.C. § 44709(a)(1)(B); 18 U.S.C. § 371.

This federal regime necessarily conflicts with state law claims that ask a jury to decide, for example, whether Boeing made incomplete or incorrect disclosures to the FAA AEG about MCAS, since evaluating those claims would "impermissibly put[] a jury into the [FAA's] regulatory shoes" and "permit them to rebalance the [FAA's] objectives." *In re Ford*, 65 F.4th at 863. Comair's claims are thus preempted to the extent they rely on what Boeing did or did not tell the FAA.

## II. Comair's fraud claims fail because Comair cannot show detrimental reliance on any alleged post-contract misrepresentations or omissions [Counts 3-6].

Comair's fraud and negligent misrepresentation claims also fail to the extent they rely on Boeing's purported post-contract misrepresentations or omissions. That is because Comair cannot show that it "reli[ed] on the truth" of these statements or omissions for any "relevant" purpose and faced "consequent damage" from its reliance. *Elcon Constr.*, 273 P.3d at 970.

Comair's sole theory of reliance with respect to post-contract issues is that it detrimentally relied on Boeing's claimed misrepresentations and omissions by not "cancel[ing] all or any of the ordered aircraft or . . . tak[ing] advantage of Boeing's 'Letter of Comfort.'" Compl. ¶¶ 154-55. But this theory fails because (i) nothing in the contract gave Comair such a termination right, and (ii) as a matter of law, Comair could not have justifiably relied on any non-contract representations, including those in the "letter of comfort."

### A. Comair had no contractual right to terminate based on Boeing's alleged misrepresentations or omissions.

Comair cannot have "relied upon a representation when [it] had no right to do so." *Williams v. Joslin*, 399 P.2d 308, 309 (Wash. 1965); *see also B.M.B. v. McMahan's Valley Stores*, 869 F.2d 865, 869 (5th Cir. 1989) ("[O]ne induced to do something one already is obligated to do suffers no injury."). Because Comair "has no 'right' to breach a contract," it "cannot rely on such a 'right'

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1   in support of [its] detrimental reliance argument." *Sundberg v. TTR Realty*, 109 A.3d 1123, 1131

2   (D.C. 2015); *see also Home Mut. v. Broadway Bank*, 53 N.Y.2d 568, 578-79 (1981) (no reliance

3   where nothing the plaintiff "could have done" to "have relieved itself of the contractual obligation

4   to which it was bound"); *Sun Life v. Imperial Premium*, 904 F.3d 1197, 1224 & n.25 (11th Cir.

5   2018) (where a party is "contractually obligated to make . . . payments," it cannot prevail on a

6   fraudulent omission theory if the alleged omissions did not "induce[]" the plaintiff "to do anything

7   that it would not have otherwise done").

8       Nothing in the contract permitted Comair to terminate based on Boeing's alleged

9   misrepresentations or omissions about pilot training, design differences between the MAX and

10  NG, MCAS, or otherwise. ████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████. None of those

13  happened for the MAX airplanes in dispute, and Comair is not claiming they did. Even if Boeing

14  had provided Comair with all the information to which Comair alleges it was entitled, Comair *still*

15  would not have had the right to cancel its MAX orders. That forecloses any justifiable reliance.

16  *See Williams*, 399 P.2d at 309.

17      **B.    Comair had no right to terminate (or any other guarantees)
            under the "letter of comfort."**

18

19      Nor does the "letter of comfort" save Comair's claims. Comair contends that this letter

20  "allowed Comair to cancel purchase of the eight flawed aircraft by January 2017 . . . and receive

21  a refund of its deposit." Compl. ¶ 155; *see also* ¶¶ 145, 274. It did no such thing.

22      *First*, the letter says nothing about cancellation or termination. *See* Paisner Decl. Ex. 18 at

23  -71. The letter instead unequivocally states that PDPs are not contractually refundable: "[w]ith

24  regard to 1% DA deposit and PDP deposits, *these funds are non-refundable in the Purchase

25  Agreement*." *Id.* (emphasis added). The clear text of the letter thus refutes Comair's fraud claims.

26  To the extent the letter suggests a typical Boeing practice of returning unspent funds, there is "no

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1    right to rely" on such a non-contractual "promise" under Washington law. *Cornerstone v.*

2    *MacLeod*, 247 P.3d 790, 794 (Wash. Ct. App. 2011).

3    *Second*, were there any doubt about the letter's import, Comair's contemporaneous conduct

4    dispels it. Venter, Comair's lead negotiator, understood that "non-refundable" means Boeing

5    "doesn't have any obligation to refund the money" to Comair, and he relayed this understanding

6    to Comair's Board. Paisner Decl. Ex. 3 (Venter 30(b)(6) Dep. 73:10-13). The Board's minutes—

7    from a meeting that occurred in December 2013, *after* executing the purchase agreement—

8    similarly reflect this: "Boeing were not prepared to commit" to making the 1% DA deposit

9    refundable "in the purchase agreement, as this would have prevented them from concluding the

10   purchase transaction." *Id.* Ex. 7 at -194. Even years later, in 2016 and 2017, Comair management

11   continued reporting to its Board that Boeing "can not commit to this [*i.e.*, refunding the 1%

12   deposit] in writing," Till Decl. Ex. 8 at -009, and that the deposit was "non-refundable," *id.* Ex. 9

13   at -88. And there is no evidence that Comair told the bank that financed its PDPs about the "letter

14   of comfort,"[19] even though it was obligated to "expressly disclose[]" to that bank any

15   "amendments, side letters, supplements, waivers or consents" that could modify the Boeing

16   contract as a condition of receiving financing. *See* Paisner Decl. Ex. 19 at -559 (Section 10.16.3).

17   *Finally*, in all events, the letter (sent September 17, 2013) is rendered irrelevant by the

18   integration clause in the contract (signed September 18, 2013), which makes clear that the purchase

19   agreement and AGTA "contain[] the entire agreement between the parties." Till Decl. Ex. 10 at

20   -78-79 (§ 5.8). Under Washington law, the "plain language of [a] written contract's integration

21   clause expressly preclude[s] the enforceability" of other understandings or communications.

22   *McKasson v. Johnson*, 315 P.3d 1138, 1142 (Wash. Ct. App. 2013); *see also Dragt v.*

23   *Dragt/DeTray*, 161 P.3d 473, 479-80 (Wash. Ct. App. 2007) (rejecting argument that "integration

24

25   ⎯⎯⎯⎯⎯⎯⎯
     [19] Paisner Decl. Ex. 2 (King Dep. 100:6-18); *see id.* Ex. 20 (Orsmond Dep. 94:25-96:1)
     (deferring to King on whether the PDPs were refundable); *id.* Ex. 1 (Venter Dep. 182:11-183:10)
26   (same, and deferring to King on whether Comair disclosed the "letter of comfort" to its bank).

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 22

clause [wa]s not enforceable"). And "[e]xtrinsic evidence offered to alter and interpret the terms of an unambiguous contract is inadmissible." *Wash. Pub. Util. v. Pub. Util. Dist.*, 771 P.2d 701, 710 (Wash. 1989); *see also U.S. Life Credit v. Williams*, 919 P.2d 594, 597 (Wash. 1996) (extrinsic evidence cannot be used to "vary[]," "modify[]," or "contradict[]" a contract).

### III.    Even if Comair prevails on its contract or negligent misrepresentation claims, it still cannot establish entitlement to non-warranty relief [Counts 1, 2, and 6].

Comair's requested relief for its contract and negligent misrepresentation claims—including a "return of all deposits" and "[r]ecission of the parties' agreements," Compl. at 74-75—hinges on Comair's alleged right to terminate the remaining airplanes (MAX 4-8). But Comair has no such right, because the contract provides only limited and exclusive ████████████, none of which include termination of the entire contract.

First, to the extent any part of MAX 1—the sole delivered airplane—was defective, Compl. ¶ 241, ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████ Comair's breach of contract and negligent misrepresentation claims for the alleged defects on MAX 1 ████████████ ██████████████████████████████████████████████████████████████████ ██████████████ Comair's principals recognized this in writing well after the grounding. Till Decl. Ex. 31 at -830; Paisner Decl. Ex. 20 (Ormsond Dep. 312:21-313:22).

In *S. A. Empresa De Viacao Aerea Rio Grandense v. Boeing*, 641 F.2d 746 (9th Cir. 1981), the Ninth Circuit held that a substantially similar iteration of this same disclaimer barred a negligence claim against Boeing. *Id.* at 751; *see also Cont'l Airlines v. Goodyear Tire*, 819 F.2d 1519, 1527 (9th Cir. 1987) (applying similar disclaimer); *Tokio Marine v. McDonnell Douglas*, 617 F.2d 936, 940-41 (2d Cir. 1980) (same). Washington courts also routinely uphold negligence waivers. *See, e.g.*, *Johnson v. Spokane to Sandpoint*, 309 P.3d 528, 532-34 (Wash. Ct. App. 2013).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1       Comair likewise cannot use any alleged delay in delivering MAX 2-3 to justify canceling

2    MAX 4-8. ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████.

8       Because Comair has no right to terminate the remaining airplanes, Counts 1, 2, and 6 are

9    barred to the extent they seek relief beyond the contractual remedies.[20]

10   **IV.**   **Comair's fraud claims for punitive damages are barred by Washington law [Counts 3-5].**

11

12       Punitive damages are contrary to Washington's public policy. *See Dailey v. N. Coast Life*,

13   919 P.2d 589, 590-91 (Wash. 1996). Accordingly, "punitive damages are not permitted" under

14   Washington law "unless expressly authorized by statute." *Baughn v. Johnson & Johnson*, 2015

15   WL 4759151, at *2 (W.D. Wash. Aug. 12, 2015) (citing *Dailey*, 919 P.2d at 590-91). "Washington

16   has no statute which authorizes exemplary damages for fraud," which encompasses punitive

17   damages. *Id.* (citation omitted). Because no statute authorizes Comair's recovery of punitive or

18   exemplary damages on its fraud claims, those claims fail to the extent they seek the recovery of

19   such damages.

20                          **CONCLUSION**

21   Boeing respectfully asks the Court to grant summary judgment dismissing all of Comair's claims.

22

23

24      [20] Comair's claim for compensatory, special, incidental, consequential, liquidated, exemplary, and punitive damages is ████████████████████████████████████████

25   ██████████████████████████████████████████████" Till Decl. Ex. 13

26   (AGTA, Ex. C § 11.2).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

* * *

2          I certify that this motion contains 8,397 words, in compliance with the Local Civil Rules.

3

4

5    Dated: June 9, 2025                    By: *s/ Michael Paisner*

6                                              Michael S. Paisner, WSBA No. 48822
                                               Zachary E. Davison, WSBA No. 47873

7                                           **Perkins Coie LLP**
                                            1201 Third Avenue, Suite 4900
8                                           Seattle, Washington 98101-3099
                                            Telephone: 206.359.8000
9                                           Facsimile: 206.359.9000
                                            Email: MPaisner@perkinscoie.com
10                                          Email: ZDavison@perkinscoie.com

11                                          Casey McGushin (admitted *pro hac vice*)
                                            **Kirkland & Ellis LLP**
12                                          333 West Wolf Point Plaza
                                            Chicago, Illinois 60654
13                                          E-mail: casey.mcgushin@kirkland.com

14                                          *Attorneys for Defendant The Boeing Company*

15

16

17

18

19

20

21

22

23

24

25

26

BOEING'S MOTION FOR SUMMARY JUDGMENT
No. 2:23-cv-00176-RSM – 25